IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| GARY BROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:17-cv-00049 |
| | ) | |
| POTOMAC FAMILY DINING GROUP | ) | By: Elizabeth K. Dillon |
| OPERATING COMPANY LLC, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Gary Brooks (Brooks) filed this action asserting claims against Potomac Family Dining Group (Potomac), the franchisee of his former employer, Applebee's restaurant, under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* Brooks, who is African American, alleges that he was subjected to race and age discrimination and terminated as a result.

Pending before the court is Potomac's motion for summary judgment, seeking judgment as a matter of law on both claims. (Dkt. No. 19.) Specifically, Potomac contends it is entitled to summary judgment because Brooks has not met his burden to establish satisfactory job performance or that he was treated differently from similarly situated employees outside the protected class. Moreover, Potomac asserts that it had a legitimate, non-discriminatory reason to fire Brooks: his inability as kitchen manager to maintain food safety and sanitation in the kitchen, as reflected by three failed eCaps audits.

The motion has been fully briefed, neither party has requested a hearing, and the court concludes that no hearing is required. For the reasons set forth herein, the motion for summary judgment will be granted.

I. BACKGROUND

Brooks is a 43-year-old African-American male who began working for Potomac in 1998 at one of its Applebee's restaurants located in Harrisonburg, Virginia. As kitchen manager, Brooks was "[b]asically in charge of the kitchen" and responsible for cleanliness, "food safety, training of food safety, [and] training of recipes." He attended a food safety class where he learned how to keep the kitchen clean, received formal training on food safety and kitchen manager duties, and received a training manual detailing his responsibilities for daily operations. Brooks was responsible for ensuring that "line checks" were completed in the kitchen twice a day, even when he was not working. A line check required checking the freshness and temperature of food "through the line" in the kitchen. In Potomac's kitchen manager training manual, it states that the kitchen manager must "run a safe and clean kitchen," "hold all managers accountable for line checks and daily Ecosure/eCaPS audits," and "be held responsible for all aspects of [his] Kitchen." (Brooks Dep. 60, 86, 95–96, 98–103, 115–16, 122, Dkt. Nos. 20-1, 26-3;[1] ServSafe Certification, Dkt. No. 20-6; Role of the KM 20, Dkt. No. 20-8.)

Potomac employs a company called EcoSure to perform food safety sanitation audits—called eCaps audits—in its restaurants. These audits are unannounced and occur twice a year. (Brown Dep. 19, Dkt. Nos. 20-2, 26-2;[2] Brooks Dep. 119–20.) At the January 15, 2015 eCaps audit, the kitchen was cited for: (1) "food and/or food contact items not being stored properly;"

---

[1] Different portions of Brooks's deposition are contained in each party's filing.

[2] Different portions of Brown's deposition are contained in each party's filing.

2

(2) "food utensils not being stored properly;" (3) "wiping cloth sanitizer solution not being stored at the proper PPM;" (4) "chemicals being stored on top of the dish machine" and not being labeled correctly; (5) "having caulk around the server's station cold wells that were moldy and not clean;" and (6) "a damaged, worn, and unclean strip curtain in the walk-in cooler." The restaurant received a failing score of 70% for its product safety. (Brooks Dep. 122–25; January 15 eCaps Audit, Dkt. No. 20-10.) Brooks did not work until closing the night before and was not working on the day of this eCaps audit. (Gillespie-Brooks Decl. ¶ 6, Ex. A at 21, Dkt. No. 26-6.)[3] Barbara Abbrescia, who is the bar manager at the Harrisonburg location and is Caucasian, worked until closing the night before. (*Id.*; Brooks Dep. 147.)

Leading up to the next eCaps audit on April 2, Shannon Brown, the area director, met with and discussed the issues in the kitchen with Brooks. She had three "coaching/counseling sessions" with him that were related to food quality and sanitation, and during them, she had concerns about food safety and sanitation in the kitchen. (Brown Dep. 6, 26, 34–35.) Brown also had visited the Harrisonburg location several times and had several conversations with Brooks during those visits regarding her concerns with food safety and sanitation. (*Id.* at 27.)

At the April 2, 2015 eCaps audit, the kitchen was cited for: (1) a "line employee washing his hands without gloves on and without soap and then returning back to the line with the same gloves;" (2) a "line employee changing gloves without washing his hands between glove change;" (3) "a cracked ice bucket in the kitchen;" (4) "low water temperature in the dish-washing machine;" (5) "improper cooling procedures" that can affect cross-contamination or "diseases growly rapidly from the temperatures being in the danger zone;" (6) out-of-date produce; (7) "unclean ceiling vents;" (8) "unclean exhaust hoods;" (9) "a rusty dry rack;" (10)

---

[3] The page numbers cited are those pages numbers supplied by the court upon docketing, so, in this case, page 21 of 34.

"an unclean microwave;" and (11) "refrigeration gaskets that weren't property maintained." Again, the restaurant received a failing score of 70% for its product safety. None of the product safety violations were related to the "front of the house" area of the restaurant. (Brooks Dep. 125–29; April 2 eCaps Audit, Dkt. No. 20-11.) Again, Brooks was not working on the day before or on the day of this eCaps audit. Barbara Abbrescia worked the closing shift the night before this eCaps audit. (Gillespie-Brooks Decl. ¶ 6, Ex. A at 17.)

After the April 2 eCaps audit, during a routine visit on April 15, 2015, Brown issued a written "Team Member Warning Notice" to Brooks. This notice was to document "multiple food safety violations." Brown testified that Brooks's kitchen was unique when compared to the kitchens of other restaurant locations due to its "level of sanitation." After she issued this notice, Brown wanted to coach and help Brooks to be successful because "[n]obody wants to fire anybody," so she went to the Harrisonburg location and "helped him clean and organize his kitchen." The notice stated, and Brooks understood, that further infractions could result in disciplinary action, including termination. (Brown Dep. 27, 29; Brown Team Member Warning Notice, Dkt. No. 20-13; Brooks Dep. 130–32.)

The general manager of the Harrisonburg location, Denver Snyder, also raised his concerns about Brooks's management of the kitchen several times following the April 2 eCaps audit. Snyder discussed his concerns about food safety, food quality, and sanitation issues in the kitchen with Brooks at the following meetings: (1) a counseling session on April 15; (2) a "Manager one on one" on April 28; (3) another counseling session on May 1; and (4) another "Manager one on one" on May 5. On May 26, 2015, Snyder issued a written "Team Member Warning Notice" to Brooks that referenced their prior meetings, laid out in detail his concerns about food safety, food quality, and sanitation in the kitchen, and set forth a plan for

4

improvement. The notice stated that "[c]ontinued habits of this type cannot and will not be tolerated," that Brooks's habits needed to be changed and fixed within 30 days, and that his employment could not continue if he did not change his behavior. Brooks had a "coach and counsel" session with Snyder about the written notice, during which they discussed food safety quality and policies, and he understood that it was in his best interest to change his behavior if he wanted to continue his employment.[4] (Snyder Team Member Warning Notice, Dkt. No. 20-14; Brooks Dep. 133–36.)

At the January 20, 2016 eCaps audit, the kitchen was cited for: (1) "baked potatoes stored directly next to containers of raw ground beef in the same walk-in cooler shelf and a full pan of cooked baking potatoes stored next to raw salmon on the same shelf;" (2) "mold in the back of the house ice scoop;" (3) "mold buildup in the fountain dispenser nozzles;" (4) "bulk rice in a [plastic container] that was not labeled properly;" (5) "sliced American cheese stores above temperature;" (6) "pork riblets stored above temperature;" (7) "sliced cheddar, sliced Swiss, and grated cheese stored above temperature;" (8) "trash and debris on the floor in the kitchen that was beyond normal operational levels;" (9) "a dish machine drain that was disconnected from the floor drain;" (10) "multiple shelves in the walk-in cooler that had mold;" and (11) "food storage racks that had dust buildup and cobwebs." Unlike the 2015 audits, the restaurant received an *overall* failing score of 73.5%, but like the 2015 audits, the restaurant received a failing score of 65% for its product safety. (Brooks Dep. 136–42; January 20 eCaps Audit, Dkt. No. 20-12.) Brooks did not work until closing the night before, but he did work the day of this eCaps audit. Adam Updike, who is the front of the house manager, Caucasian and in his twenties, worked the

---

[4] Brooks quibbles about "the number and seriousness of counseling and/or warnings given to Plaintiff," (Mem. Opp'n Mot. Summ. J. 13), but this is not a material dispute because it would not change the court's analysis.

closing shift the night before and the day of this eCaps audit. (Gillespie-Brooks Decl. ¶ 6, Ex. A at 3; Brooks Dep. 146–47.)

From 2015 to 2016, Brooks was the only kitchen manager at the Harrisonburg location. (Brooks Dep. 142–43.) And from 2015 to 2016, Brown believed that, when compared to the other restaurants under her supervision, food safety and sanitation was more concerning and "pretty critical" at the Harrisonburg location. (Brown Dep. 35–36.)

Mike Lemieux and Snyder fired Brooks the day after the January 20 eCaps audit. His termination letter stated that it was his responsibility "to be in control of the business every minute of [his] shift," noted that he had been coached and counseled multiple times with no change in his behavior, and explained that he was being terminated for continued failure on eCaps audits. Brooks did not complain about race or age discrimination at his termination meeting. When asked if he believed that Potomac acted with ill will, Brooks responded: "I believe they were trying to do the right thing, but I think they did it the wrong way." (Termination Letter, Dkt. No. 20-15; Brooks Dep. 143, 166.) Abbrescia and Updike were not fired. (Brooks Dep. 146.)

Brooks now alleges that his termination constituted race discrimination in violation of Title VII and age discrimination in violation of the ADEA and that Potomac's stated reasons for his termination were not the true reasons, but a pretext to hide its discriminatory animus. (Compl. ¶¶ 19–29, Dkt. No. 1.)

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

6

genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

**B. Discrimination in Termination Claim**

Title VII prohibits practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits discrimination with respect to employment decisions having a direct economic impact, like terminations or demotions, as well as actions that create or perpetuate a discriminatory or abusive working environment. *See Vance v. Ball State*

7

*Univ.*, 570 U.S. 421, 426–27 (2013). Similarly, the ADEA protects employees who are at least 40 years old from discrimination by making it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a), 631(a). To prove a discriminatory discharge under the ADEA, a plaintiff must demonstrate that age was the "but for" cause of his termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *EEOC v. Balt. Cty.*, 747 F.3d 267, 273 (4th Cir. 2014).

To evaluate Title VII and ADEA claims when, as here, there is no direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gross*, 557 U.S. at 177–78; *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (applying the Title VII *McDonnell Douglas* framework to an age discrimination claim under the ADEA). Under this framework, if an employee establishes a prima facie case of discrimination by a preponderance of the evidence, then the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802–03; *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). Once the employer articulates such a reason, the burden shifts back to the plaintiff to establish by a preponderance "that the employer's non-discriminatory rationale is a pretext for intentional discrimination." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 258 (4th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Here, Brooks has presented no direct or circumstantial evidence of discrimination. Brooks admitted he "didn't really have anything" and "really couldn't prove anything" when asked if he ever reported to human resources or his supervisor that he felt discriminated against

based on his race or age. (Brooks Dep. 167.) Also, when asked, "So you just felt that you were being discriminated [against] based on your age or race?," Brooks responded, "Yes." (*Id.* at 168.) As such, the court will analyze Brooks's discrimination claims under the familiar burden-shifting framework set forth in *McDonnell Douglas*, as the parties agree is appropriate.

**1. Prima facie case of discrimination**

Brooks claims that he was discriminated against based on his race and age. Absent direct evidence, Brooks bears the burden to establish a prima facie case of discrimination by showing: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Potomac does not challenge, for purposes of summary judgment, that Brooks can establish the first and third elements of his claim. But it argues that Brooks's claim fails because there is insufficient evidence from which he could establish the second and fourth elements.

*a. Satisfactory job performance*

As to the second element, Potomac argues that Brooks's job performance as kitchen manager was unsatisfactory because the kitchen failed three eCaps audits "due to poor food safety, quality, and sanitation," Brown gave Brooks three verbal warnings, and Brown and Snyder gave Brooks two written warnings that alerted Brooks to the possibility of termination if there was no improvement. (Mem. Supp. Def.'s Mot. Summ. J. 13–14, Dkt. No. 20.) Because the decision-maker's perception—rather than the self-assessment of the plaintiff—is determinative, *Dejarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998), Potomac contends that the evidence shows Brooks did not satisfactorily perform his duties as kitchen manager. (Mem. Supp. Def.'s Mot. Summ. J. 14.)

9

The physical presence of Brooks either the night before or during an eCaps audit is not the only consideration relevant to determining whether his job performance as kitchen manager was satisfactory. *See, e.g.*, *Johnson v. Outback Steakhouse of Fl., Inc.*, 328 F. Supp. 2d 1115, 1121 (D. Kan. 2004) (noting in this Title VII race discrimination action that "Plaintiff's responsibilities for what happened at the restaurant as kitchen manager did not always cease at the end of his shift" to conclude that his job performance was unsatisfactory). Nor does the fact that the entire managerial team could be written up, (Brown Dep. 33), or that the managers worked together absolve him of his responsibility for the kitchen's food safety and sanitation. Brooks seems to argue that a shared general responsibility for the restaurant and an attitude of teamwork among the assistant managers strips each individual assistant manager of his responsibility to perform his primary duties in his assigned space of the restaurant. (*See* Mem. Opp'n Mot. Summ. J. 3, 6, 11, Dkt. No. 26.)

Even though all assistant managers were *generally* responsible for food safety and helping to conduct tasks such as line checks, (Brown Dep. 30–32), Brooks's individual job performance was still found to be unsatisfactory. The kitchen manager manual states that Brooks was responsible for *all* aspects of the kitchen, including holding other assistant managers accountable for line checks and setting up the closing manager for success. (Role of the KM 13, 20.) What follows from this responsibility, then, is that the kitchen manager is held accountable if any aspect of his kitchen falls below expected standards. And, in addition to the description of his duties, it is clear that, in practice, his supervisors believed he was responsible for the cleanliness of his kitchen at all times because they disciplined him for the failed audits.

Brooks also cannot claim that the three coaching and counseling sessions with Brown, Brown's written warning notice, the two counseling sessions with Snyder, the two "Manager one

10

on one" meetings with Snyder, and Snyder's written warning notice did not alert him that his employer was dissatisfied with his job performance. (Brown Dep. 26, 34–35; Brown Team Member Warning Notice; Snyder Team Member Warning Notice; Brooks Dep. 133–36.) He clearly acknowledged his understanding at the time of these warnings was—and the warnings themselves state—that further infractions could result in termination. (Brooks Dep. 130–36.)

Moreover, it is inconsequential that the restaurant never failed an inspection by the Virginia Department of Health. (*See* Mem. Opp'n Mot. Summ. J. 4, 11.) Brooks has not provided any evidence that the eCaps audit and Virginia Department of Health inspection address the same issues. *See, e.g.*, *Bhatnagar v. Sunrise Senior Living, Inc.*, 835 F. Supp. 2d 1, 7 (D.D.C. 2013) (rejecting plaintiff's attempt to rely on his kitchen passing D.C. health inspections to establish satisfactory job performance when he did not show that the health inspections addressed the same issues as the internal audits relied on by the defendant).

Brooks simply cannot blame anyone but himself for his sub-par performance as kitchen manager. The numerous counseling sessions, conversations with his superiors related to their concerns about the kitchen, and written warnings, in addition to the kitchen's many citations and contributions to product safety failures on three eCaps audits make clear that his job performance was unsatisfactory. *See Lee v. Va. Beach Sheriff's Office*, No. 2:13-cv-109, 2014 U.S. Dist. LEXIS 51969, at *21 (E.D. Va. Apr. 14, 2014) (discussing how an audit revealing multiple deficiencies helped to establish that the plaintiff had not proved satisfactory job performance). Of course, it is well-settled that the decision-maker's perception of job performance is the relevant one. Here, and despite Brooks's own perception of a job well done, Potomac both found and communicated to Brooks that he fell short of his expected job performance. *See Dejarnette*, 133 F.3d at 299.

*b. Different treatment from similarly situated employees outside the protected class*

Potomac argues that Snyder, Updike, and Abbrescia were not treated more favorably than Brooks and were not similarly situated. (Mem. Supp. Def.'s Mot. Summ. J. 14–19.) Brooks contends that he was singled out for the failed eCaps audits while other assistant managers who, he alleges, had "overlapping duties" and oversaw the kitchen during the audit, were not terminated. (Mem. Opp'n Mot. Summ. J. 12–13.)

Because Snyder oversaw the entire restaurant and Updike and Abbrescia had different job titles and responsibilities as front of the house manager and bar manager, respectively, Potomac argues that they were not similarly situated to Brooks. Additionally, Brooks received more discipline and knew of the possibility of termination if he continued his unsatisfactory job performance. Potomac emphasizes that Snyder was also terminated, due to the issues documented in the three eCaps audits, and that Updike and Abbrescia were disciplined after the failed 2016 eCaps audit that related to their areas of the restaurant. (Mem. Supp. Def.'s Mot. Summ. J. 14–19.) Last, Potomac highlights that there were no similarly situated employees at its other restaurant locations because no other restaurant under the supervision of the same area director had similar food sanitation and safety issues, and even if there were, there was no differential treatment. (Reply Supp. Mot. Summ. J. 12–13, Dkt. No. 28.)

To show that he and a comparator are similarly situated, Brooks must "show that they are similar in all relevant aspects," including evidence that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). In addition, "two

12

employees who do not report to the same supervisor, do not have the same job title, or do not have the same responsibility level, are not similarly situated." *Monk v. Potter*, 723 F. Supp. 2d 860, 877 (E.D. Va. 2010) (citing *Lightner v. City of Wilmington*, *N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)).

Brooks is not similarly situated to Snyder. Because Snyder was the general manager of the restaurant and Brooks was the kitchen manager, they were not subject to the same standards and did not deal with the same supervisor. (Reid Decl. ¶ 7, Dkt. No. 20-20.) Rather, Snyder supervised Brooks, and they therefore did not hold "comparable supervisory position[s]" and were not similarly situated. *See Haywood*, 387 F. App'x at 359; *Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007).

Additionally, Brooks has not shown that he is similarly situated to Updike or Abbrescia. He had a different job title and held different responsibilities in the restaurant. (Reid Decl. ¶ 7; Pl.'s Suppl. Answers Def.'s Interrog. ¶ 5, Dkt. No. 20-3); *see Lightner*, 545 F.3d at 265; *Dickens v. MCI Telecomms. Corp.*, No. 94-2494, 1996 WL 93810, at *4 (4th Cir. Mar. 5, 1996) (finding that the plaintiff did not introduce evidence of similarly situated employees because "[a]lthough they had the same job title, their job responsibilities differed"). He also had been warned and counseled multiple times with the knowledge that further infractions could lead to termination (Brown Dep. 26, 34–35; Brown Team Member Warning Notice; Snyder Team Member Warning Notice; Brooks Dep. 133–36), and the kitchen received multiple citations on three eCaps audits (January 15 eCaps Audit; April 2 eCaps Audit; January 20 eCaps Audit). In contrast, Updike and Abbrescia only received performance improvement plans after the failed 2016 eCaps audit that included their areas of the restaurant. (Updike Performance Evaluation, 20-16; Updike Performance Improvement Plan, 20-17; Abbrescia Performance Evaluation, 20-18; Abbrescia

13

Performance Improvement Plan, 20-19.) Brooks's continuous performance issues were far more negative and persistent. Thus, because of their different jobs and distinguishable work histories, Brooks is not similarly situated to Updike and Abbrescia. *See Sook Yoon v. Sebelius*, 481 F. App'x 848, 850 (4th Cir. 2012) (noting that because work history is relevant to determining comparability, the plaintiff did not show similarly situated employees when only the plaintiff had a history of misconduct and previous reprimands); *Austen v. HCA Health Servs. of Va., Inc.*, 5 F. App'x 253, 254 (4th Cir. 2001) (finding that a male employee was not similarly situated to several female employees because only he had "a record of disciplinary warnings").

Brooks also cannot show that Snyder, Updike, or Abbrescia received more favorable treatment. Snyder was terminated as general manager "due to multiple failed eCaps scores and persistent food safety and sanitation concerns in the Kitchen at the Harrisonburg restaurant." (Reid Decl. ¶ 5.) Additionally, the performance improvement plans did not favor Updike and Abbrescia because, when compared to Brooks, their areas of the restaurant only failed one eCaps audit and they did not receive the same amount of discipline. (Updike Performance Improvement Plan; Abbrescia Performance Improvement Plan.) Brooks's discipline was harsher because his job performance was less satisfactory. As such, even if Snyder, Updike, and Abbrescia were valid comparators, they did not receive more favorable treatment than Brooks.

In his initial response, Brooks reserved additional arguments until after Potomac provided discovery regarding potential comparators.[5] (Mem. Opp'n Mot. Summ. J. 2, 12.) After receipt of that discovery, in a conclusory fashion, Brooks challenged Potomac's credibility regarding its claim that it had no documentation of the identities of some assistant managers during the time frame specified in the magistrate judge's order. Otherwise, Brooks does not

---

[5] This was ordered by the magistrate judge's granting of his motion to compel. (Dkt. No. 25.)

make any further arguments based on the information and documentation Potomac provided in response to the order. (Pl.'s Am. Suppl. Br. Opp'n Summ. J., Dkt. No. 30.)

While Brooks may believe that Potomac cannot credibly claim it lacks documentation regarding some of its past assistant managers (and valid comparators, according to Brooks), he has not provided any foundation for this assertion. Moreover, Potomac provided an explanation for its failure to produce certain documents, stating that "it did not maintain manager rosters at its locations between 2013 and 2014," and thus could not provide personnel files for assistant managers at some of its locations. (Def.'s Suppl. Resp. Pl.'s Req. Produc. Docs. 9–11, Dkt. No. 29-2.)

For all of these reasons, Brooks has not shown sufficient evidence or a disputed issue of fact as to this prong, and, in any event, Brooks has still failed to establish satisfactory job performance, the second prong.

**2. Defendant's legitimate, non-discriminatory reason for termination**

Notwithstanding the court's finding above, assuming *arguendo* that Brooks does present a prima facie case of discriminatory termination, the burden shifts to Potomac to offer a legitimate, nondiscriminatory reason for his firing. *Guessous v. Fairview Property Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *see Reeves*, 530 U.S. at 142 ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'") (citation omitted).

Potomac has set forth a clear reason for terminating Brooks. Specifically, Potomac has explained that it engaged in progressive discipline of Brooks, including repeated counseling and written warnings that alerted him to the potential of termination following his "inability to effectively maintain food safety and sanitation in the kitchen, which resulted in three straight failed eCaps inspections." (Mem. Supp. Def.'s Mot. Summ. J. 19–20.) Thus, it contends that the

15

last failed eCaps audit warranted termination, as it reflected Brooks's "repeated failure to satisfactorily perform job duties as a Kitchen Manager." (*Id.* at 19.)

Because "[j]ob performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision," Brooks's consistently unsatisfactory job performance in the eyes of his employer provided a valid reason for his termination. *Evans*, 80 F.3d at 960 (citing *Burdine*, 450 U.S. at 258–59). And, "when an employer articulates a reason for discharging the plaintiff not forbidden by law," it is not the court's role to determine if that reason "was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette*, 133 F.3d at 299 (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–11 (7th Cir. 1997)).

Brooks was terminated because the kitchen's failure in three eCaps audits reflected his inability to manage according to his employer's expectations. He was also warned that he needed to change his behavior as kitchen manager in order to keep his job. These are the reasons Potomac provided for his termination, and they are both legitimate and non-discriminatory. Therefore, the court finds that Potomac has met its burden of production by providing a legitimate, non-discriminatory reason for Brooks's termination.

### 3. Plaintiff's showing of pretext

If the employer articulates a non-discriminatory reason for the adverse action, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." *Guessous*, 828 F.3d at 216 (citing *Burdine*, 450 U.S. at 252–56). Having found that Potomac met its burden of production and has articulated a legitimate nondiscriminatory reason for the adverse employment action, "the *McDonnell Douglas* frame-work—with its

presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves*, 530 U.S. at 142–43 (internal quotation marks and citations omitted). To show pretext, Brooks must prove that the explanation given for his termination "is unworthy of credence," *id.* at 143 (quoting *Burdine*, 450 U.S. at 256), which requires more than a mere showing that the "proffered reason is unpersuasive, or even obviously contrived," *id.* at 146 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). "At this last step the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Lettieri v. Equant Inc.*, 478 F.3d 640, 646–47 (4th Cir. 2007) (citations and internal quotation marks omitted).

Applying those principles here, no reasonable jury could find for Brooks. When asked if he believed Potomac acted with ill will, Brooks responded: "I believe they were trying to do the right thing, but I think they did it the wrong way." (Brooks Decl. 160:17–21.) Potomac has offered a reason for Brooks's termination, and Brooks does not contest that the kitchen—for which he admits responsibility—failed three eCaps audits, despite warnings and attempts to help him and improve his performance.

In addition, his pretext arguments simply repeat arguments the court has already rejected. Brooks asserts that Potomac's policy regarding when eCaps evaluations lead to termination is informal because there is no specific policy "setting forth clear or firm standards." (Mem. Opp'n Mot. Summ. J. 14.) Accordingly, Brooks again contends that it was applied differently to him than to the other assistant managers at the Harrisonburg location. As previously discussed, the other assistant managers were disciplined when the areas of the restaurant for which they were responsible faced similar issues. However, no area of the restaurant experienced as many issues as the kitchen, so Brooks cannot now claim that there was a selective application of an informal

17

policy which demonstrated pretext. He points to nothing upon which a jury could reasonably rely to determine that the real reason for his termination was discrimination. Quite simply, there is insufficient evidence from which a jury could find that the real reason for Brooks's termination was race or age discrimination.

In sum, Brooks has failed to show that he was a victim of intentional discrimination. Because he has not established a prima facie case of discrimination, Potomac has offered a legitimate and non-discriminatory reason for his termination, and Brooks has not shown that the reason for his termination was a pretext, the court will grant summary judgment in Potomac's favor.

### III. CONCLUSION

For the foregoing reasons, the court will grant defendant's motion for summary judgment. A separate order will be entered.

Entered: March 31, 2019.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge